UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | ) Chapter 11 |
| MICHAEL KEITH SCHUGG dba SCHUBERG HOLSTEINS, | ) Substantively Consolidated ) ) |
| Debtor. | ) Case No. 2:04-13326-GBN |
| _____ | ) |
| In re: | ) |
| DEBRA SCHUGG, | ) **FINDINGS OF FACT,** |
| | ) **CONCLUSIONS OF LAW** |
| Debtor. | ) **AND ORDER** |
| _____ | ) |

The contested attorney fee and cost reimbursement application of Wells Fargo Bank, N.A. was tried to the court as a bench trial on January 5 and February 13, 2007. An interim order was entered on April 4, 2007, announcing the decision to sustain the trustee's objections to the application and overrule debtor Michael Keith Schugg's objections.

The court has considered sworn witness testimony, admitted exhibits, pleadings and the facts and circumstances of this case. The following findings and conclusions are now entered:

**FINDINGS OF FACT**

1. Michael Keith Schugg ("debtor") filed a voluntary Chapter 11 bankruptcy case in the District of Arizona on July 29, 2004. Debtor's spouse, Debra Schugg filed her Chapter 11 case in this district on November 1, 2004. These cases have been substantively consolidated.[1] Debtor filed a motion for use of cash collateral on August 12, 2004. Wells Fargo did not object. The parties lodged an agreed order which was subsequently extended. Wells Fargo and debtor filed a stipulated cash collateral order on October 11, 2004, that was extended by agreement on November 5. When debtor and Mrs. Schugg subsequently could not agree on cash collateral terms, the court appointed Grant Lyon as Chapter 11 trustee on December 9, 2004. A stipulation regarding cash collateral was approved the next day. A subsequent cash collateral stipulation was reached between the trustee and the bank on January 20, 2005. Thereafter additional orders regarding cash collateral use were entered by stipulation. Joint Pretrial Order ("JPO") of December 30, 2006, at pgs. 2-3, administrative docket item ("dkt.") 672.

2. On April 29, 2005, the Gila River Indian Community ("the Community") objected to cash collateral use and asserted an aboriginal ownership interest in certain real property ("Section 16") of the bankruptcy estate. Wells Fargo, claiming a security interest in *inter alia,* Section 16, put Transnation Title Insurance Company on notice of the Community's claim by letter of

---

[1]The debtors are separately represented. Mrs. Schugg did not prosecute an objection to the requested legal fees and costs.

May 4, 2005. The title company had issued a $4 million lender's title insurance policy to the bank. The trustee and Wells Fargo filed an adversary proceeding against the Community on May 25, 2005. On June 6, 2005, the title company sent a letter accepting the bank's tender of prosecution of the complaint regarding the Community's claims. The bank's present legal counsel was retained by the insurer to represent Wells Fargo in the litigation, effective May 4, 2005. JPO *id.* at 3-4.

3. Wells Fargo and the trustee lodged a stipulated cash collateral order on July 1, 2005, containing terms requested by the bank that granted a first priority lien on all estate property, (subject to certain reservations of rights) and a super priority bankruptcy claim. Debtor and creditor United Dairymen of Arizona ("UDA") objected, asserting Wells Fargo was already adequately protected. The court sustained this objection. In August of 2005, the trustee dealt with a dairy herd tuberculosis infection through discussions with the U.S. Department of Agriculture. Trustee was also negotiating with the bank to use cash collateral for herd eradication. On September 13, the trustee filed his initial motion seeking authority to sell the herd, distribute sale proceeds, determine that the bank was adequately protected and utilize cash collateral. The trustee withdrew this motion on September 20, 2005. JPO at 4.

4. Shortly thereafter, Wells Fargo and the trustee submitted a fifth stipulated cash collateral order that stated the bankruptcy estate had no claims against the bank and that

Case 2:04-bk-13326-GBN   Doc 725   Filed 04/10/07   Entered 04/10/07 15:34:22   Desc
Main Document      Page 3 of 24

should claims actually exist, they were released. Debtor objected to the release. The court sustained debtor's objection by order of December 12, 2005. Earlier, the trustee filed his amended herd liquidation motion on October 7. Under the existing fifth supplemental cash collateral order, an attempted use of cash collateral without the bank's prior written consent was a material default. As so defined, the trustee's amended herd liquidation motion constituted a material default. The bank's objection to the amended herd liquidation motion was overruled by the court. An order was entered on October 24, 2005. JPO at 5-6.

5. The bank appealed the herd liquidation order to the United States District Court for the District of Arizona. Wells Fargo and the trustee filed appellate briefs in January and February of 2006. On November 4, 2005, the trustee filed a sale and settlement motion regarding acquisition of Section 16 by the Community. Debtor's objection to the sale was overruled. The sale was approved on December 8, 2005. Debtor appealed to the United States District Court, which stayed the Community's purchase and ultimately reversed the sale on May 23, 2006. Neither the trustee nor the Community appealed this decision. *Id.* at 6.

6. On January 9, 2006, the trustee filed a motion for use of additional cash collateral of $58,000 for expenses related to a herd depopulation agreement with the Agriculture Department. Wells Fargo objected and obtained discovery orders authorizing an examination of the trustee and document production. The court

subsequently overruled the bank's objection and approved the
additional cash collateral use for herd liquidation. Wells Fargo
then filed a motion seeking an indication whether the bankruptcy
court would agree to hear a reconsideration of the herd
liquidation order. When this court agreed to hear the
contemplated motion, the district court granted remand. The
bank's Rule 60 motion was filed on March 3. 2006. The trustee
filed his objection on March 28 and shortly thereafter, filed a
motion to pay the bank in full.[2]  JPO at 6-7.

7. On April 6, 2006, this court denied the bank's Rule
60(b) motion. Wells Fargo did not appeal. Debtor withdrew his
objection to the trustee's Wells Fargo payment request. The
trustee thereafter paid all principal and interest, pursuant to
an order of May 22, 2006. Also pursuant to order, the trustee
placed sufficient funds to secure payment of the bank's legal
fees and expenses pending resolution of its contested fee
application of August 1, 2006. Both the trustee and debtor
objected to the application. Debtor's pending Chapter 11 plan
does not identify any claims the estate holds against Wells
Fargo. *Id.* at 7-8.

---

[2]The trustee's April 3, 2006, motion asserted that he had spent
thousands of dollars fighting Wells Fargo in district and bankruptcy
court, notwithstanding both courts' recognition that the bank was
adequately protected. The trustee expected the bank to continue its
"relentless pursuit--no matter the cost--to prohibit the Trustee's
use of Wells Fargo's cash collateral. " Dkt. 494 at p. 5. Trustee
sought leave to pay the bank in full to eliminate additional legal fees
regarding cash collateral and a letter of credit obligation drawn down
by Wells Fargo. *Id.* at 7-8. Trustee emphasized that notwithstanding
his full payment, the trustee and debtor reserved all causes of action
held against the bank. *Id.* at 9.

-5-

8. Larry Clayton is a Vice President of Wells Fargo Bank and was responsible for managing the bank's loans to Michael and Debra Schugg. He is the Loan Adjustment Group Team Manager for Arizona and has 43 years experience in commercial banking. Eighteen years has been spent at Wells Fargo. He is responsible for debtor's loans and directed the bank attorneys' work in the bankruptcy. Although he has bank superiors to whom he reports, he made all the case decisions and merely kept his superiors advised. The bank did not precipitate debtor's bankruptcy filing. Rather, debtor filed bankruptcy because he lost a jury trial to the UDA. Because the UDA's judgment was junior to the bank's secured position, debtor's problem with UDA was not particularly troubling to Wells Fargo. What troubled Mr. Clayton in the bankruptcy was the dairy herd's tubercular infection and the Community's claims on the bank's real property collateral. Admitted trial exhibit ("ex.") B at pgs. 1-3; trial testimony ("test.") of Larry Clayton.

9. Mr. Clayton's declaration stated the Community's claim and the herd's infection created a "substantial risk" for the bank during the bankruptcy. Yet, he felt the bank was always oversecured by its collateral. He knew the bankruptcy court had expressly found the bank to be oversecured on at least one occasion. His internal bank reports reflected that the bank was oversecured. Wells Fargo received monthly payments of principal and interest during the bankruptcy. Regardless, he directed his

counsel to continue litigation against the trustee's use of cash collateral, including a threat to file a motion to convert the case to Chapter 7. He knew the bank's legal fees would be passed on to the bankruptcy estate and the debtor. He expressed concern in his declaration of a collateral shortfall. However, this concern is not expressed in his internal reports. The bank's internal report of July 15, 2004, reflects a downgrading of the loan from a five to a six rating (a nine is a loss), based on the UDA judgment and the possibility of bankruptcy. The collateral rating did not decline, however. The report estimates the bank is oversecured. Mr. Clayton felt justified in proceeding as if the bank did not have a $4 million title insurance policy protecting its real property collateral. The fact finder does not consider this conduct reasonable. Ex. B at p. 6; test., Ex. 95 at ¶ ¶14, 35; Ex. 36 at pgs 2-3.

10. In his deposition, Mr. Clayton testified that even if he had no concerns regarding title policy coverage, he possibly would take the same litigative posture, to accelerate payments from the bank's collateral. At the time of the herd sale, he had no concerns about the bank receiving payment. His litigative decisions were driven, in part by his belief that the bank was legally entitled to payment of its cash collateral. Mr. Clayton is not an attorney. He personally prepared a problem loan report of August 11, 2004, that does not further downgrade the loan, does not forecast a loss and indicates the loans were "well" secured, with a loan to collateral margin of 57.6% and

Case 2:04-bk-13326-GBN   Doc 725   Filed 04/10/07   Entered 04/10/07 15:34:22   Desc
Main Document    Page 7 of 24

1  cash flow sufficient to pay the institution.  The borrower's
2  rating remained at six (although bankruptcy had been filed), with
3  a high probability for a future downgrade over time.  Mr.
4  Clayton's report of September 3, 2004, recommended a borrower's
5  downgrade to seven, based on the bankruptcy filing and lack of a
6  date certain for repayment of principal.  The collateral quality
7  rating was not downgraded and the loans were listed as "well
8  secured." Test.; Ex. 32, pgs. 3-5; Ex. 35 at p 2.

9          11. Mr. Clayton's internal report of July 14, 2005,
10 stated the aboriginal claim to section 16 " . . . appears to be
11 without merit. . . ." and speculates the Community " . . . is
12 believed to be making this claim through the bankruptcy court in
13 order to stall any pending sale, and force the Trustee to sell
14 the property to GRIC at a price substantially below current
15 market value (the initial offer by the GRIC has been $3.2MM for
16 property worth $26MM+ to developers in the immediate area).  The
17 GRIC claim to ownership is believed to be without merit, based on
18 the following chain of events...." This was Mr. Clayton's opinion
19 at the time. His report continues: "The Bank has a $4MM ALTA
20 title policy on the real estate in question, and the title
21 company has acknowledged their liability to the Bank under the
22 policy (the title company has also retained counsel for the Bank
23 to defend this action against GRIC, and they are paying all legal
24 fees incurred in the defense of the Bank's position)."  Ex. 4 at
25 p. 2; test., Ex 95 at attachments C, D.

26
27
28

12. The internal report of October 19, 2005, contains identical language regarding the lack of merit of the aboriginal claim, speculation as to the motives for the claim and the acknowledged availability of a $4 million title insurance policy. The problem loan report of January 17, 2006, again states the aboriginal claim " . . . appears to be without merit...." It notes that a court must nonetheless decide ownership before title can be transferred and the district court has advised the matter would not be heard for two to three years. "In the unlikely event that GRIC is awarded the property in question, the Bank has a $4MM ALTA title policy and the title company has acknowledged their liability to the Bank under the policy...." Ex. 28 at p. 2241; Ex. 27 at p. 2229.

13. On May 12, 2006, Mr. Clayton received approval of his request to continue to waive the requirement that the debt be listed as a non accruing, charged off item. The waiver was granted through June 30, 2006. His waiver request indicated the bank's remaining loan of $2,366,005 was secured by cash and real estate of $6,565,000 appraised value or $4,012,000 marginal value at 65% of appraisal. The loan to collateral value was calculated to range between 36% and 59%. His request indicated that "Since 11/05 the Bank has received total paydowns of $4.9MM. The remaining loan balance of $2.4MM is believed to be well secured, and in the process of collection. Interest is current, and will continue to be paid on a monthly basis until the Bank debt has been paid in full." Mr. Clayton proposed three alternative

courses for the bank through the waiver period: (1) payment in full from cash currently in the trustee's possession, (2) sale of the note[3] or (3) the Bank filing a motion to convert the case to a Chapter 7. The witness' January 31, 2006, annual review proposes a strategy that:

> In the short term . . . proceeds from the herd eradication will reduce the Bank debt to $2.4MM. In the longer term (2-3 years), the real estate can be sold after litigation on ownership has been resolved and the remaining Bank debt should then be paid in full (interest on the Bank debt will be kept current during this process). If ownership is decided in favor of GRIC (and the Bank does not have a valid 1st DOT), the $4MM ALTA title policy will pay off the remaining Bank balance of $2.4MM.

Ex. 9 at 2555, 2558-59, 2563.

14. The witness' testimony is that he had a concern that the Community had a valid claim and that the title insurer would not honor the policy. He concedes all internal reports fail to mention such title policy concerns. All recite that the bank's loans are fully collateralized, unimpaired and performing. The reports do indicate a desire for a faster payoff of the bank. Mr. Clayton does not recall discussing his concern over the title policy with anyone other than bank counsel. He testified this failure to mention such concern in the bank's internal reports was a belief they would be discoverable in litigation. While this

---

[3]The court has refused to reimburse the bank's legal expenses of $9,669.50 for attempting to market the note. Minutes of November 7, 2006, dkt. 637.

results in his superiors not being informed of his concerns, he explained that the "trigger point" to warn his superiors had not been reached. The last downgrade to the loans occurred on September 3, 2004. The last collateral downgrade was made in October of 2004, when the bank discovered it had failed to describe 82 acres of Section 16 in its deed of trust. The witness' testimony is that, although the internal reports do not reflect this view, no reasonable banker would feel secured by the Section 16 property, given the aboriginal title claim, even with a lender's title insurance policy in place. The court does not find this testimony credible. Test.; Ex. 109, Ex. 95 at p. 3, ¶14.

15. The bank negotiated a July 1, 2005, stipulated cash collateral order granting Wells Fargo additional security of a first priority lien in all real, personal, tangible or intangible property of debtors' estates, including all accounts, contract rights, documents, general intangibles, tax refunds, payment rights, all causes of action and all proceeds. Mr. Clayton sought this extra security, although he believed the bank was oversecured, because he felt some of the bank's liens had "issues." Had the order become final, it would have allowed the bank to recover the lien on the mis described 82 acres of Section 16, subject to the Community's aboriginal claim. Debtor and unsecured creditor UDA objected to this additional lien. On August 15, 2005, the court sustained the objections, finding the bank was already adequately secured and no evidence had been presented that its collateral was depreciating. Order of July 1,

2005 at pgs. 3-4, ¶ 7 C, Dkt. 256; Test., Dkts. 264, 266, 268, 276.

16. The bank negotiated an October 4, 2005, stipulated second supplemented cash collateral order with the trustee that released all estate claims against the bank arising prior to the order's date. Mr. Clayton was warned by the trustee at the time that there might be objections to the release. Nevertheless, the bank pursued the release, in part, because of the trustee's allegations the bank wrongfully drew on a collateralized letter of credit. Although the witness was not aware of any formal claims pending against the bank, he insisted on obtaining the release and litigating objections to it. Normally the bank's loan documentation does not contain such a release. Debtor objected on October 19, 2005. At a December 9 hearing the court sustained the objection and struck the release from the cash collateral order. Dkt. 307 at pgs. 2-3, ¶4; Test., Dkt. 315.

17. In August of 2005, the trustee received an offer from the U.S. Department of Agriculture to purchase the estate's interest in the infected dairy herd for $9.3 million. The bank had not distinctly downgraded the rating of its collateral because of the infection. Prior to the disease's appearance, the bank valued the herd at $5 million. The trustee was concerned over personal liability in the range of seven figures for federal tax implications from the herd liquidation. He proposed a payment of $4.9 million to the bank. Mr. Clayton's tax analysis, conducted with the assistance of bank counsel, indicated a tax reserve of

-12-

$1 million or less would be sufficient to protect the trustee from
personal liability. The bank did not accept or understand the
trustee's tax analysis, which justified a larger tax reserve.
Accordingly, while encouraging the sale, the bank sought a lower
tax reserve. The trustee proposed that should he have
overestimated the tax, that the additional reserve amount be paid
to the bank, with interest. Mr. Clayton refused, preferring a
larger, immediate payment. What the bank ultimately received from
sale proceeds was sufficient to fully pay the herd loan, the feed
loan and a portion of the Section 16 real estate loan. Test.

18. The bank was unhappy with the trustee's use of
$58,000 in cash collateral funds to finish the herd liquidation,
preferring instead that the trustee use unsecured estate monies
to liquidate its collateral. The bank objected and requested
discovery from the trustee. This involved production of 1,700
pages of documents and the opportunity to view or copy a banker's
box of tax documents. While the trustee refused to agree to a
stay pending appeal of the sale order, believing that the bank was
adequately protected, he offered to sequester $ 2.6 million
pending further agreement and pay the bank $1.6 million.
Regardless, the witness viewed the trustee's attitude as "take it
or leave it" or "all or nothing" approaches. The court does not
find this to be a reasonable characterization. Test., Ex. 95 at
pgs. 12-13, ¶57.

19. The Transnation lender's title policy had
exclusions. The bank put the insurer on notice of the Community's

Section 16 claims.  The insurer accepted defense of the title litigation, hired the bank's counsel as its attorneys and never issued a reservation of rights notice.  Regardless, the witness had concerns the insurer would subsequently refuse to honor the policy.  Although the bank was always oversecured, Mr. Clayton testified he had concerns.  Such concerns do  not appear in internal reports to  bank superiors.  Mr. Clayton never discussed his concerns with the insurer.  In Mr. Clayton's 43 years of experience, he has found it infrequent that a title insurer declines coverage.  The witness denies the bank's only concern was how soon it would be paid.  The fact finder does not find the creditor's  title policy concerns credible.  Test., Ex. 95 at "B."

20. The bank opposed the herd sale liquidation order because of the size of the tax reserve and other administrative set asides.  This creditor lost, appealed, sought and obtained a remand from the appellate court, returned to the bankruptcy court to file a motion for reconsideration, lost that motion, did not appeal further and was paid in full, except for disputed bank attorney fees.  Mr. Clayton received congratulations when the trustee paid the bank, but no extra compensation.  The court does not find creditor's litigation strategy to be reasonable in the context of the bank's secured positions.  Test.

21. The witness' declaration states the trustee sought to require the bank to accept a collateral shortfall of more than $1 million, leaving the creditor totally dependent on the title policy.  Yet in October of 2005, after receiving $4.9 million, it

was owed $2.4 million secured by equipment liens, receivables, and $1.7 million in cash, (that subsequently grew to $2 million), Section 16 (minus 82 acres) and the excess of the tax reserve. The $58,000 sought by the trustee to close out the herd liquidation, opposed by the bank, came from the $1.7 million cash collateral. At all times, the bank categorized debtor's loans as "sub standard," which is a classification that attracts regulatory attention. This category is below that of "special mention," but is higher than a "doubtful" rating. After threatening to file a motion to convert the case to Chapter 7, the bank was paid in full on May 22, 2006, consisting of $2.366 million plus accrued interest of $4 million. The bank withdrew as a plaintiff in the district court litigation against the Community. The trustee will continue to litigate the aboriginal claim. Contested bank attorney fees of $342,000 are held in a reserve account. Ex. 95 at p. 6, ¶25, test., Ex.13.

22. The court finds Mr. Clayton to clearly be both a gentleman and the most experienced banker in the room. As a witness on cross examination, he made no attempt at evasion and genuinely tried to cooperate with adverse counsel. Nonetheless, as the decision maker, he is not an unbiased witness. His explanations of concern over the bank's security position, not reflected in any significant manner in internal records, as justification for aggressive litigation is not credible to the fact finder. Test.

23. The trustee objects to the bank's legal fees and costs associated with its uncompleted appeal of the trustee's motion to sell the herd and related relief, the bank's motion requesting a *Crateo* indication from the bankruptcy court regarding a pending appeal and its unsuccessful motion for reconsideration. Objector argues such legal services were not reasonably believed to be necessary to protect the bank at the time they were rendered. Objectionable fees and costs are calculated by the trustee as $115,043. February 13, 2007, testimony of Gary G. Lyon ("Lyon test."), JPO at 2, Ex. 92 at "A", Ex. 11 at ¶6, p. 2.

24. The trustee believed the bank's real property collateral had a value of $10.3 million, based on the Community's purchase offer, as well as hearsay presented by the debtor. He further believes the bank's total collateral package had a value of $16 million. Because of the bank's aggressive, time consuming, expensive litigation, the trustee felt forced to pay off this creditor early, to preserve the estate for other creditors. He believes his relationship with the bank deteriorated at the time decisions were made to partially pay the bank from herd sale proceeds. His understanding was Mr. Clayton would pursue every legal avenue to force full payment by the late Fall of 2005 and would oppose every subsequent trustee move. Because the relationship operated appropriately until October of 2005, the trustee's objections are narrower than those of the debtor. Although he has previously testified in court as an expert witness, the trustee does not consider himself an expert on

1  reasonable bank conduct.   Mr. Lyon is not a bankruptcy panel
2  trustee, did not have extensive trustee experience and this
3  unusual, complex case was his first service as a Chapter 11
4  trustee.   However, the court finds him to be an experienced and
5  knowledgeable business consultant, with 15-16 years of financial
6  workout experience and a credible witness.   Lyon Test., Ex. 11 at
7  pgs. 7-10.

8       25. The trustee refused to agree to a stay in February
9  of 2006, while the bank pursued a district court appeal of the
10  sale order.   This refusal was because the bank had not sought a
11  stay in bankruptcy court and the trustee was concerned about his
12  personal tax liability from the transaction.   The trustee was
13  required to produce many pages of documents to the bank, until the
14  parties agreed to stay discovery.   Trustee testified he attempted
15  to work with Wells Fargo, but as a fiduciary, could not
16  exclusively act solely in the bank's interests.   Prior to
17  liquidation of the herd, he attempted to reach agreement regarding
18  allocation of sales proceeds.   The bank refused, so the matter was
19  litigated.   The result was court approval on October 21, 2005, of
20  a distribution scheme essentially proposed to the bank originally.
21  While the trustee's distribution resulted in a $700,000 exposure
22  of the bank, this exposure was more than covered by the bank's
23  Section 16 lien and title policy.   The result of adopting the
24  bank's distribution proposal would have caused the estate to
25  become unnecessarily illiquid, in the event the Community's $10.3
26
27
28

million sale offer did not close. The fact finder finds this testimony credible. Lyon test., Ex. 11 at ¶22-30.

26. The bank converted approximately $3.349 million of long term debt into immediately due debt by refusing to renew a standby letter of credit in July of 2005. This refusal caused the bond trustee to draw on the letter, which exacerbated the estate's liquidity problem. Regardless, since the trustee concluded the bank legally had a right to cause the draw, he reasoned he was not giving anything of value in agreeing to release the bank from liability. However, the trustee believes the draw down was unreasonable, as it nearly doubled the bank's current debt, at a time when the creditor claimed it was concerned over the collateral available to cover its immediate debt. The witness testified it would have been more advantageous for the estate to continue to make payments on this long term debt (it was current in payments at the time) and deal with the obligation in a Chapter 11 plan. Technically however, the letter of credit's bond was in default because of debtor's bankruptcy filing. Because of the bank's aggressive and litigious posture, the trustee filed his motion to pay it in full, shortly after a threat to file a motion to convert and to stay payment of taxes. The court finds this testimony credible. Lyon test., Ex. 11 at ¶¶13-21 and 33, Ex. D.

27. The debtor presented no evidence in support of his fee objection that seeks a reduction of $205,508. His expert witness, David Zacharias, was excluded from testifying for the

1  reasons announced in open court on January 5, 2007.  Debtor's fee
2  objections will be denied.

3          28. The court finds that the bank was oversecured at
4  all relevant times until paid in full.  There was no reasonable
5  danger it would not be paid.  Regardless, it chose to force the
6  trustee to pay immediately, rather than await plan confirmation.
7  An oversecured creditor's desire for an immediate exit strategy
8  does not require payment of all legal costs and fees by the estate
9  and junior creditors.  A creditor in such an advantageous position
10  should simply protect its claim and not engage in costly
11  litigation that frustrates an efficient, effective reorganization.
12  Since the bank owned neither the dairy, the herd nor the real
13  property, it had no right to aggressively pressure the estate and
14  trustee for an early payoff.  While now conceding it was
15  adequately protected and receiving current principal and interest
16  payments, it nevertheless appealed the adequate protection ruling,
17  then short circuited the appeal process to seek another ruling
18  from the bankruptcy court under Civil Rule 60.  The court finds
19  applicant failed to meet its burden of demonstrating that the
20  legal services identified by the trustee were reasonable at the
21  time rendered.

22          29. To the extent any of the following conclusions of
23  law should be considered findings of fact, they are hereby
24  incorporated by reference.

25

26                          **CONCLUSIONS OF LAW**

27

28                                    -19-

1. To the extent any of the above findings of fact should be considered conclusions of law, they are hereby incorporated by reference.

2. Jurisdiction of this bankruptcy case is vested in the United States District Court for the District of Arizona. That court has referred all cases, arising under Title 11 of the United States Code or related to a bankruptcy case, to this court. 28 U.S.C. §157(a)(1994), Amended District Court General Order 01-15. This case having been appropriately referred, this court has core bankruptcy jurisdiction to enter a final order resolving the fee application and objections. 28 U.S.C. §157(b)(2)(B), (O). No party has argued to the contrary. *See* JPO at 2.

3. Conclusions of law are reviewed *de novo*. Factual findings are reviewed for clear error. *Hanf v. Summers (In re Summers),* 332 F.3d 1240, 1242 (9th Cir. 2003). Findings of fact, whether based on oral or documentary evidence, will not be set aside unless clearly erroneous. Due regard is given to the opportunity of the bankruptcy court to judge witness credibility. Rule 8013, *F.R.B.P.* A bankruptcy court's award of attorneys' fees is not disturbed, unless the court abused its discretion or erroneously applied the law. *Higgins v. Vortex Fishing Systems, Inc.*, 379 F.3d 701, 705 (9th Cir. 2004).

4. Under 11 U.S.C. §506 (b), a creditor is entitled to attorney fees and costs, if (1) the claim is an allowed secured claim, (2) the claim is oversecured by available collateral, (3) the fees are reasonable and (4) fees and costs are provided for

under the agreement between the parties. *Kord Enterprises II v.*
*California Commerce Bank (In re Kord Enterprises II)*, 139 F.3d
684, 687 (9th Cir. 1988), *Hassen Imports Partnership v. KWP*
*Financial VI (In re Hassen Imports Partnership)*, 256 B.R. 916, 925
(9th Cir. BAP 2000). When fees provided for in the underlying
agreement are reasonable and the creditor is oversecured, an award
is mandatory. *Unsecured Creditors' Committee v. Puget Sound*
*Plywood,* Inc., 924 F.2d 955, 959 (9th Cir. 1991)(Affirming a fee
reduction), *Pasatiempo Properties v. Le Marquis Associates (In re*
*Le Marquis Associates)*, 81 B.R. 576, 578 (9th Cir. BAP 1987).

   5. Here the parties dispute only whether the amount
sought is reasonable. The key determinant is whether the expenses
and fees within the scope of the agreement reflect actions that
similarly situated creditors would take. If the actions and fees
are clearly outside such a range, they are not reimbursed from the
estate. A court inquires whether, considering all relevant
factors, the creditor reasonably believed the services were
necessary to protect its interests. In making such a
determination, the court looks not to state law, but makes an
independent evaluation. 81 B.R. at 578. This court's evaluation
is that not all actions taken were reasonable. Given that the
creditor was oversecured at all times, that the fiduciary trustee
was paying adequate protection payments with interest without
default and that the aboriginal rights challenge to the Section
16 collateral was protected by title insurance, the bank's appeal

of the first amended order, its *Crateo* motion and Rule 60 motion were not within the range of reasonable creditor behavior.

6. A secured claim holder has the affirmative burden of proving the reasonableness of its fee under §506(b). *Atwood v. Chase Manhattan Mortgage Co. (In re Atwood)*, 293 B.R. 227, 233 (9th Cir. BAP 2003). The burden is to prove by a preponderance of the evidence both the reasonableness of fees and that they were necessary to protect the creditor's interests. *Washington Federal Savings Bank v. McGuier (In re McGuier)*, 346 B.R. 151, 158 (Bankr. W.D. Pa. 2006). The bank has failed to carry this burden.

7. The reasonableness requirement prevents overreaching or collusive fee arrangements. A court should not reward aggressive legal actions that harass and oppose a debtor or trustee at every stage. Oversecured creditors do not have a blank check to incur fees and costs that will be automatically reimbursed. *In re Circle K Corp.*, 141 B.R. 688, 692 (Bankr. D. Az. 1992). The court concludes that the bank's above actions constituted overly aggressive behavior that crossed into harassment. While bank counsel's legal actions were skilled and precisely met the creditor's demands for extremely conservative protection of its secured interests, these services should be borne by the client that requested them, not by the estate and unsecured creditors.

8. By contrast, debtor did not support his more extensive fee objection with admissible testimony or documents. The requested fee amount cannot be considered unreasonable simply

because a party feels it is excessive. Objectors have the responsibility to challenge the information and produce evidence controverting that produced by the applicant. A gestalt reaction that there was too much time spent is not sufficient. *In re Blackwood Associates, L.P.*, 165 B.R. 108, 111-12 (Bankr. E.D.N.Y. 1994). The trustee met this burden. The debtor did not.

**ORDER**

The trustee's objection is sustained. The debtor's objection is overruled. The trustee and applicant will confer to reach a stipulation as to the amount of fees to be reduced, based on these findings and conclusions and lodge a stipulated judgment. In the event the parties cannot agree, trustee will lodge and serve a proposed judgment, subject to objections as to form.

Dated this 10th day of April, 2007.

_____
George B. Nielsen, Jr.
UNITED STATES BANKRUPTCY JUDGE

Copies emailed this 10th
day of April, 2007, to:

Christopher H. Bayley
SNELL & WILMER, L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-0001
Email: Cbayley@swlaw.com
Attorney for Trustee Grant Lyon

-23-

```
 1 │ Robert J. Miller
   │ BRYAN CAVE, LLP
 2 │ Two N. Central Avenue, Suite 2200
   │ Phoenix, AZ 85004
 3 │ Email: rjmiller@bryancave.com
   │ Attorney for Wells Fargo Bank, N.A.
 4 │
   │ Dale C. Schian
 5 │ SCHIAN WALKER, P.L.C.
   │ 3550 N. Central Avenue, #1700
 6 │ Phoenix, AZ 85012-2115
   │ Email: ecfdocket@swazlaw.com
 7 │ Attorney for Debtor
   │
 8 │ By: /s/Rachael M. Stapleton
   │       Judicial Assistant
 9 │
10 │
11 │
12 │
13 │
14 │
15 │
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
26 │
27 │
28 │
```

-24-